DANIEL PERRY OSWALD,

                    Plaintiff,

        v.                                    Case No. 17-cv-1437-pp

DEPARTMENT OF CORRECTIONS, SCOTT WALKER,
BRIAN FOSTER, JEFFERY MANLOVE,
BELINDA SCHRUBBE, MCCREEDY,
MICHEAL CHARLES, CHRISTINE DEYOUNG,
NANCY KAMPUIS, STADTMUELLER,
JOHN/JANE DOES, WEBER, and DR. KELLEY,

                    Defendants.

---

## DECISION AND ORDER GRANTING THE PLAINTIFF'S MOTION FOR LEAVE TO PROCEED WITHOUT PREPAYMENT OF THE FILING FEE  (DKT. NO. 2), DENYING MOTION (UNSIGNED) TO REQUEST TO PAY THE FILING FEE FROM RELEASE ACCOUNT (DKT. NO. 7), GRANTING MOTION FOR LEAVE TO FILE AMENDED COMPLAINT (DKT. NO. 8), SCREENING THE AMENDED COMPLAINT AND DEFERRING RULING ON THE PLAINTIFF'S MOTION FOR PRELMINARY INJUNCTION (DKT. NO. 10)

---

        The plaintiff, who is representing himself, is a prisoner at Kettle Moraine

Correctional Institution. He filed this lawsuit under 42 U.S.C. §1983, dkt. no.

1, along with a motion for leave to proceed without prepayment of the filing fee,

dkt. no. 2. Because the plaintiff was incarcerated when he filed his complaint,

the Prison Litigation Reform Act (PLRA) applies to this case. 28 U.S.C. §1915.

This order resolves the plaintiff's motion and screens his complaint.

# I.   Motion for Leave to Proceed without Prepayment of Filing Fee (Dkt. No. 2)

The PLRA allows an incarcerated plaintiff to proceed with his lawsuit without prepaying the case filing fee, as long as he meets certain conditions. One of those conditions is that the plaintiff must pay an initial partial filing fee. 28 U.S.C. §1915(b). On October 24, 2017, the court ordered the plaintiff to pay an initial partial filing fee of $2.61. Dkt. No. 5. The court received that fee on November 7, 2017. Accordingly, the court will grant the plaintiff's motion. He will be required to pay the remainder of the filing fee over time in the manner explained at the end of this Order.

The plaintiff has requested that he be allowed to pay the remainder of the filing fee from his release account rather than from his regular account. Dkt. No. 1 at 18; Dkt. No. 7. The court will not grant this request. The PLRA requires the court to collect filing fees from a "prisoner's account." 28 U.S.C. §1915(b). The term "prisoner's account" encompasses both a prisoner's release account and general account. Spence v. McCaughtry, 46 F. Supp. 2d 861, 862 (E.D. Wis. 1999). However, "given the purpose of the release account to provide funds to the prisoner upon his or her release from incarceration, the Court does not deem it prudent to routinely focus on the release account as the initial source of funds to satisfy the filing fee payment requirements of the PLRA." Smith v. Huibregtse, 151 F. Supp. 2d 1040, 1042 (E.D. Wis. 2001). The court will order that the institution deduct future filing fee payments from the plaintiff's regular account.

## II. Motion for Leave to File Amended Complaint (Dkt. No. 8)

The plaintiff's original complaint was nineteen pages long, and named thirteen defendants: The Department of Corrections, Governor Scott Walker, Warden Brian Foster, Dr. Jeffrey Manlove, Belinda Schrubbe, John Doe McCreedy, Micheal Charles, Christine DeYoung, Nancy Kampuis, Jane Doe "for the WCI Special Needs Comm.," John Doe "for the WCI Special Needs Comm.," Jane Doe Stadtmueller, RHU director Doe and Dr. Weber. Dkt. No. 1 at 1. The proposed amended complaint is twenty-one pages long, and adds "Dr. (Doe) Kelley." Dkt. No. 9. Because the court had not yet screened the original complaint, the court will grant the plaintiff's motion for leave to amend, will treat the amended complaint as the operative complaint, and will screen the amended complaint.

## III. Screening of the Plaintiff's Amended Complaint (Dkt. No. 9)

The law requires the court to screen complaints brought by prisoners seeking relief against a governmental entity or officer or employee of a governmental entity. 28 U.S.C. §1915A(a). The court must dismiss a complaint if the plaintiff raises claims that are legally "frivolous or malicious," that fail to state a claim upon which relief may be granted, or that seek monetary relief from a defendant who is immune from such relief. 28 U.S.C. §1915A(b).

To state a claim, a complaint must contain sufficient factual matter, accepted as true, "that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that

allows a court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. (citing Twombly, 550 U.S. at 556).

To proceed on a claim that his civil rights were violated under 42 U.S.C. §1983, a plaintiff must allege that: 1) he was deprived of a right secured by the Constitution or laws of the United States; and 2) the defendant was acting under color of state law. Buchanan-Moore v. Cty. of Milwaukee, 570 F.3d 824, 827 (7th Cir. 2009) (citing Kramer v. Vill. of N. Fond du Lac, 384 F.3d 856, 861 (7th Cir. 2004)); see also Gomez v. Toledo, 446 U.S. 635, 640 (1980). The court gives a *pro se* plaintiff's allegations, "however inartfully pleaded," a liberal construction. See Erickson v. Pardus, 551 U.S. 89, 94 (2007) (quoting Estelle v. Gamble, 429 U.S. 97, 106 (1976)).

A.    The Plaintiff's Allegations

On September 5, 2014, defendant Dr. Jeffery Manlove diagnosed the plaintiff with vertigo. Dkt. No. 9 at ¶18. Dr. Manlove prescribed daily medication and gave the plaintiff a cane to help the plaintiff stabilize himself when a dizzy spell occurred. Id. at ¶¶19-20. According to the plaintiff, Manlove told the plaintiff that he hoped the cane would prevent "some falls," but that if the plaintiff found that he required an elevator pass, he should request one by writing out a medical slip and "he would be accommodated." Id. at ¶21. Five days later, the plaintiff requested an elevator pass because his dizzy spells made him afraid to go up and down the stairs. Id. at ¶22.

Two days after making the request, Nurse Schaffer (who is not a defendant) had an appointment with the plaintiff to discuss MRI results. Id. at

¶24. At the appointment, she also addressed the plaintiff's request for an elevator pass. Id. Nurse Schaffer consulted with defendant Belinda Schrubbe, the Health Services Manager. Id. According to the plaintiff, Schrubbe denied the plaintiff's request even though she knew (1) he had vertigo, (2) Manlove had prescribed medication and given the plaintiff a cane, (3) the plaintiff had a lower-tier restriction with no stairs, and (4) he had almost fallen down stairs after becoming dizzy. Id. at ¶25-26.

A few days later, the plaintiff had a psychological services appointment with defendant Micheal Charles, the plaintiff's mental health provider. Id. at ¶27. While climbing the stairs to get to his appointment, the plaintiff started to feel dizzy. Id. at ¶28. When he got to the top of the stairs, Charles reached out and braced the plaintiff against the wall to prevent him from falling. Id.

The plaintiff states that he spoke to Charles about his fears of falling during his vertigo episodes. Id. at ¶29. The plaintiff states that he asked Charles to intervene with Health Services about an elevator pass. Id. The plaintiff asserts that Charles refused, but that he agreed to make a note in the plaintiff's records. Id.

At the end of the appointment, the plaintiff states that he and Charles walked toward the exit, which is at the top of three flights of stairs. Id. at ¶30. The plaintiff alleges that he asked Charles to let him use the elevator (which was right next to the stairs) rather than the stairs. Id. at ¶21. Charles allegedly said no, even though he had allowed the plaintiff to use the elevator for an entire month before he received his cane. Id. at ¶30-31.

As the plaintiff descended the first of the three flights of stairs, he became dizzy on the landing between the first and second flights. Id. at ¶32. The plaintiff explains that he tried to stabilize himself with the railing and his cane, but he was unable to. Id. at ¶32-33. The plaintiff states that he fell face-first down about fifteen stairs, and laid unconscious at the bottom for an unknown period of time. Id. at ¶33. The plaintiff asserts that he ended up being taken to the Health Services Unit (HSU) for extreme pain in his lower back, neck, wrist and elbow. Id. at ¶34.

After the fall, defendant Nurse Christine DeYoung examined the plaintiff. Id. at ¶38. The plaintiff alleges that she refused to contact the doctor and refused to try to get an elevator pass for the plaintiff. Id.

The plaintiff explains that after this fall, he experienced extreme headaches, vomiting and dizziness. Id. at ¶39. The plaintiff states that he also was in extreme pain for many days after the fall and that he has back spasms and pain to this day. Id. at ¶39. The plaintiff states that he contacted Schrubbe directly and informed her that he had fallen down the stairs as a result of not having an elevator pass. Id. at ¶41.

Two days later, on September 17, 2014, Nurse Schaffner (who is not a defendant) examined the plaintiff following his complaints of dizziness, fatigue, vomiting and extreme pain following the fall. Id. at ¶42. Nurse Schaffner placed the plaintiff on the list to see the doctor. Id. at ¶42. Less than a week later, Nurse Slinger (who is not a defendant) informed the plaintiff that he was experiencing post-concussion syndrome due to a concussion he suffered as a

result of the fall. Id. at ¶44. One day after that, Nurse Schaffner again examined the plaintiff following complaints of neck and back pain and extreme headaches. Id. at ¶45.

A couple of weeks after the fall, on September 30, 2014, the plaintiff wrote to Lori Aslum (who is not a defendant), the health and services nursing coordinator for the Department of Corrections. Id. at ¶46. The plaintiff explains that she had replied to a letter that he had written to James Greer, the health and services director. Id. The plaintiff asserts that this shows that "there was awareness of this matter and the denial of the plaintiff's medical needs allowing them to intervene, which they did by giving the plaintiff an elevator pass." Id. The plaintiff states that Schrubbe approved an elevator pass for the plaintiff the next day, on October 1, 2014. Id. at ¶47.

A few months later, on January 6, 2015, the plaintiff contacted defendant Nancy Kampuis, the ADA Coordinator. Id. at ¶50. The plaintiff explains that he told her he wanted to be transferred to another institution because he was unable to access activities within his current institution, such as recreation, hobby, chapel, library and mental health treatment. Id. He noted that, at that time, he did not have a current elevator pass (the plaintiff explains later in his complaint that he was issued a series of temporary elevator passes, some of which were allowed to expire before he received a new pass, id. at ¶¶55, 57) and that some areas of the institution could not be accessed by elevator. Id. at ¶50.

About a week later, Kampuis allegedly responded to the plaintiff and explained to him that his elevator passes were only temporary, so it would not be appropriate to transfer him to another institution based on a non-permanent need. Id. at ¶52. The plaintiff alleges that Kampuis' decision was based on misleading information given to her by Schrubbe. Id. at ¶53.

At some point, Schrubbe retired. Id. at ¶56. On March 11, 2016, after Schrubbe retired, the plaintiff received a permanent elevator pass from the new health services manager, defendant McCreedy. Id. at ¶57. Now that the plaintiff's elevator pass was permanent, he decided to contact Kampuis again and request a transfer based on his inability to access church, hobby, recreation or library due to the lack of elevators. Id. at ¶58. According to the plaintiff, Kampuis responded that she was not responsible for placement decisions. Id. at ¶59.

The plaintiff also contacted health services about his inability to access certain areas of the institution due to a lack of elevators. Id. at ¶60. This request was directed to McCreedy, id. at ¶61, who allegedly canceled the plaintiff's elevator pass after finding that the plaintiff did not have a disability or restriction necessitating one, id. at ¶62. The plaintiff alleges that the "entire special needs committee"—including defendants McCreedy, Stadtmueller, RHU Program Director Doe and Kampuis—"were involved in this injustice." Id. at ¶63.

A couple of weeks later, on May 12, 2016, the plaintiff was going down some stairs in the social services building. Id. at ¶68. He explains that about

four or five stairs from the bottom, he experienced a dizzy spell and was unable to steady himself and he fell. Id. The plaintiff explains that he suffered additional injury to his neck and back. Id. at ¶¶68, 73.

The plaintiff asserts that Nurse Jensen (who is not a defendant) was one of the people who arrived at the site of the fall, and asked him why he did not have an elevator pass; Jensen expressed concerns about the plaintiff's injuries. Id. at ¶71. Jensen told the plaintiff that vertigo could be dangerous, because dizzy spells could come on at any time, causing loss of balance and falling. Id. at ¶72. The plaintiff was "immediately seen" by Manlove. Id. at ¶74. According to the plaintiff, Dr. Manlove was "shocked" that the plaintiff did not have a valid elevator pass. Id. at ¶75. The plaintiff asserts that Dr. Manlove checked the electronic medical logs, which revealed that, despite McCreedy's representations, the plaintiff still had an elevator restriction. Id. Manlove said that he would "look into it and speak with the proper personnel." Id. at ¶76.

The plaintiff asserts that the next day, he woke up in a lot of pain. Id. at ¶77. The plaintiff states that he was in so much pain, he had to be transported to health services in a wheelchair. Id. at ¶78. The plaintiff states that someone at health services gave him an extra dose of his vertigo medication and sent him back to his cell. Id.

The plaintiff states that Manlove saw him on multiple occasions between his vertigo diagnosis in September 2014 and 2016. Id. at ¶79. He says that numerous times, he asked Manlove, Shrubbe and others for "expert care" and "evaluation from an outside specialist," but that these requests were denied. Id.

He says that over a two-year period, he re-injured his back numerous times due to falls. Id. at ¶80. The plaintiff indicates that he has extreme neck problems, migraines, and numbness/pain in his arms and hands due to nerve damage. Id.

On May 19, 2016, the plaintiff received a memo (he does not state who wrote the memo) stating that the plaintiff did not have a valid elevator pass because there was no need for an accommodation. Id. at ¶81. The plaintiff states that he also received a written reply from McCreedy stating that the plaintiff did not have a disability. Id.

On June 27, 2016, after two years of the plaintiff complaining about his dizziness and repeated falling, the plaintiff says he was finally seen by a physical therapist "with an office down the hall from the defendant Manlove." Id. at ¶84. The plaintiff states that after two visits to physical therapy, he was practically cured of all of his dizzy spells. Id. at ¶86. A few months later, the plaintiff was seen by another physical therapist (who is not a defendant) at the institution who has specialized training in treating vertigo. Id. at ¶87. The physical therapist informed the plaintiff that the treatment he received worked and his vertigo was cured. Id. at ¶91. He also told the plaintiff that vertigo can cause severe headaches and that the medication Dr. Manlove had prescribed was not used for the type of vertigo the plaintiff had been suffering from. Id. at ¶¶89, 91, 92.

The plaintiff explains that McCreedy was transferred to Kettle Moraine Correctional Institution, "after the previous incidents at WCI," and then that

the plaintiff also was transferred to KMCI in November 2016. Id. at ¶¶98, 99. The plaintiff say that he had a valid special needs slip at the time of his transfer. Id. at ¶101. But when he arrived at KMCI, the plaintiff says, defendant Weber (whom the plaintiff describes as the institution's nurse practitioner) took away all of his special accommodations—adult diapers, migraine medication and clean linens as they became soiled. Id. at ¶102. The plaintiff says he told Weber that he was indigent, but Weber said that was too bad, that the plaintiff did not need any of the accommodations. Id.

In January 2017, the plaintiff saw a neurologist at an off-site hospital for treatment of his neck problems. Id. at 103. The neurologist recommended increasing some of the plaintiff's medications, adding another and giving the plaintiff a permanent lower bunk restriction. Id. The plaintiff says he also got a recommendation from the spine clinic at the University of Wisconsin Madison hospital. Id. at ¶107.

In March 2017, the plaintiff went to Weber again to try to get the adult diapers and other accommodations he'd been denied. Id. at ¶108. Weber again denied his requests. Id. Later that month, a unit officer contacted HSU to try to get the plaintiff the items he needed. Id. at ¶109. On March 28, 2017, McCreedy again denied the plaintiff the items he needed. McCreedy told the plaintiff in writing that the plaintiff did not need these items, despite the fact that McCreedy had been aware at WCI, and was aware at KMCI, that the plaintiff needed them. Id. at ¶110.

On April 8, 2017, the plaintiff again woke up to soiled sheets, clothes, and a mattress. Id. at ¶111. Two days later, the plaintiff's clinical psychiatrist told the plaintiff that the issue was medical, not psychological, and that Health Services had to "handle it." Id. at ¶112. The next day, on April 11, 2017, Nurse Polinski (who is not a defendant) told the plaintiff that because of numerous calls from the unit officer, McCreedy finally had ordered an investigation to see if the plaintiff needed the items. Id. at ¶113. The plaintiff says that between them, McCreedy and Weber denied him basic necessities for some four months. Id. at ¶114.

On April 21, 2017, the plaintiff says that defendant Kelley "renewed all of the plaintiffs special needs items" relating to incontinence and migraines, and that Kelley "made sure to follow the previous order[s]" from the spine specialist and the neurologist. Id. at ¶118. On December 19, 2017, however, Kelley and McCreedy discontinued the medication that the neurologist had prescribed, "for the purposes of punishment and punishment only." Id. at ¶120. The plaintiff says that he "was also told"—he does not say by whom—that while he was in segregation, he could not have physical therapy. He says that he " was denied a month and a half of these weekly sessions at the malicious hands of McCreedy and Kelley." Id. at ¶122. The plaintiff alleges that, as of the time of his amended complaint, McCreedy was continuing to use his position as the manager of the HSU to deny the plaintiff medical treatment. Id. at ¶126.

B.    The Court's Analysis

At the outset, the court must dismiss several of the defendants the plaintiff has named. First, the court must dismiss defendants Scott Walker and Brian Foster. The plaintiff did not make any specific allegations against either of these individuals. It appears that the plaintiff may have named them because they either employ or supervise the people the plaintiff believes deprived him of his constitutional rights. Section 1983 does not allow plaintiffs to sue people based on the errors of their employees/subordinates. See Pacelli v. deVito, 972 F.2d 871, 878 (7th Cir. 1992); West By and Through Norris v. Waymire, 114 F.3d 646, 649 (7th Cir. 1997)("[T]he doctrine of *respondeat superior* is not available to a plaintiff in a section 1983 suit."). Only the particular individuals who deprived the plaintiff of his rights can be held liable under §1983. Because the plaintiff has not alleged that Scott Walker or Brian Foster were personally involved in depriving him of his rights, the court will dismiss them as defendants.

The court also must dismiss defendants Stadtmueller, John Doe RHU Program Director, and Jane and John Doe "for the WCI Special Needs Committee." The only time the plaintiff mentions these individuals in the amended complaint is when he alleges that the "entire special needs committee"—including Stadtmueller and RHU Program Director Doe "were involved in this injustice." Dkt. No. 9 at ¶63. By "this injustice," it appears that he plaintiff means McCreedy's canceling his elevator pass after claiming that the plaintiff did not have a disability or a restriction. This allegation is

conclusory at best; the plaintiff does not describe any specific actions that Stadtmueller, John Doe RHU Program Supervisor or any of the other members of the Special Needs Committee (other than McCreedy) took to deprive him of his rights. The court will dismiss them as defendants, because the plaintiff has not alleged sufficient facts to demonstrate that they were personally involved in denying him his civil rights.

That brings us to the remaining defendants—Manlove, Schrubbe, McCreedy, Charles, DeYoung, Kampuis, Weber and Kelley, as well as the Wisconsin Department of Corrections. The plaintiff alleges that these defendants were deliberately indifferent to his serious medical needs.

"Prison officials violate the Eighth Amendment's proscription against cruel and unusual punishment when their conduct demonstrates 'deliberate indifference to serious medical needs of prisoners.'" Gutierrez v. Peters, 111 F.3d 1364, 1369 (7th Cir. 1997). This standard contains both an objective element (that the medical needs be sufficiently serious) and a subjective element (that the officials act with a sufficiently culpable state of mind). Id.

The court finds that the plaintiff has alleged sufficient facts to allow him to proceed on a claim that defendants Schrubbe, McCreedy, Charles, DeYoung, Weber and Kelley were deliberately indifferent to his serious medical needs, which arose in connection with his dizzy spells, incontinence and/or migraines. The court also concludes that the plaintiff has alleged sufficient to proceed on a deliberate indifference claim against Manlove, based on his allegations that Manlove persisted in an ineffective treatment and delayed sending the plaintiff

to a specialist to address the plaintiff's vertigo. The court also will allow the plaintiff to proceed against these individuals on his related state law negligence claims.

Finally, the plaintiff's allegations that defendant Kampuis failed to accommodate his disability, resulting in his inability to access the programs and activities offered at his institution, implicate the Americans with Disabilities Act (ADA) and the Rehabilitation Act. Those two statutes prohibit discrimination against qualified individuals because of their disability, which can include a failure to accommodate. Jaros v. Ill. Dep't of Corrections, 684 F.3d 667, 671 (7th Cir. 2012). Because the relief available under both statutes is the same, and because the plaintiff "can have but one recovery," the court "may dispense with the ADA and the thorny question of sovereign immunity." Id. at 671-72 (citations omitted).

To state a claim under the Rehabilitation Act, a plaintiff must allege that: (1) he is a qualified person, (2) with a disability, and (3) the Department of Corrections denied him access to a program or activity because of his disability. Id. at 672. The Seventh Circuit has explained that, while "the Rehabilitation Act does not expressly require accommodation," the Supreme Court has held that the overall statute creates such a duty. Id. Further, "[r]efusing to make reasonable accommodation is tantamount to denying access." Id.

The court finds that at this early stage, the plaintiff has alleged sufficient facts to show that his physical limitations qualify him as a protected person

under the Rehabilitation Act. He also has alleged facts that suggest that his inability to access various programs and activities at his institution were a result of his disability. The court will allow him to proceed on claims for damages and injunctive relief under the Rehabilitation Act.

The court notes, however, that under the Rehabilitation Act, the proper defendant is not Kampuis; it is the state agency. "[E]mployees of the Department of Corrections are not amenable to suit under the Rehabilitation Act . . . ." Jaros, 684 F.3d at 670 (citing 29 U.S.C. §794(b); 42 U.S.C. §12131). For that reason, the court will dismiss Nancy Kampuis as a defendant (because the plaintiff has not stated a constitutional claim against her). The court will allow the plaintiff to proceed against the Wisconsin Department of Corrections on a Rehabilitation Act claim only.[1]

## IV.    Motion for Preliminary Injunctions (Dkt. No. 10)

Finally, the plaintiff has filed a motion asking the court to issue a preliminary injunction. Dkt. No. 10. He alleges that McCreedy continues to retaliate against him by making "medical decisions pertaining to the plaintiff and his needs with a malicious intent," despite the fact that McCreedy is not a medical professional. Id. at 1. The plaintiff says that he is "being denied" the ability to have physical therapy while in segregation, that McCreedy has refused to intervene to make sure the plaintiff gets his medications and adult

---

[1] The court will not allow the plaintiff to proceed on an Eighth Amendment deliberate indifference claim, or on state law negligence claims, against the Department of Corrections. The Wisconsin Supreme Court has held that the Department of Corrections is protected from suit under the doctrine of sovereign immunity as to those types of claims. Mayhugh v. State, 364 Wis.2d 208, 228-29 (Wis. 2015).

diapers, and that McCreedy has denied him special accommodations for his vertigo and other disabilities. Id. The plaintiff also alleges that Kelley creating policies that make him suffer—again, denying him physical therapy while he is in segregation, refusing to follow the suggestions of the off-site specialists, denying the plaintiff a medical double mattress, and deterring the plaintiff from going to the HSU because of the $7.50 co-pay required for each visit. Id. at 2. The plaintiff also says that, while he currently receives adult diapers and clean linens, there is no guarantee that McCreedy and Kelley won't stop this in the future. Id. at 3.

The plaintiff asks the court to order that he not be required to pay co-pays, that he be given a double mattress, that he be given certain medication, that McCreedy be demoted, that all HSU managers be required to have some sort of medical training, that the defendants send him to another specialist, and that the defendants be forced to follow all medication and treatment plans ordered by specialists. Id. at 4.

"[A] preliminary injunction is an extraordinary remedy which is not available unless plaintiffs carry their burden" of proving the factors the Seventh Circuit has laid out. Roland Mach. Co. v. Dresser Indus., Inc., 749 F.2d 380, 383 (7th Cir. 1984) (quoting Shaffer v. Globe Protection, Inc., 721 F.2d 1121, 1123 (7th Cir. 1983)). A plaintiff must show that "he has no adequate remedy at law or will suffer irreparable harm if the injunction is denied; that this harm will be greater than the harm the defendant will suffer if the injunction is granted; that the plaintiff has a reasonable likelihood of success on the merits;

and that the injunction will not harm the public interest." Id. (citing various cases). The plaintiff must show both that he has no adequate remedy at law, and that he will suffer irreparable harm if the court does not grant the injunctive relief. Id. at 386. Both of these factors involve a determination by the court as to whether "the plaintiff will be made whole if he prevails on the merits and is awarded money damages." Id.

The court will not rule on the plaintiff's motion for injunctive relief until McCreedy and Kelley have been served with the complaint. Once they have been served, the court will issue an order requiring them to respond to the plaintiff's motion.

## V.     Conclusion

The court **GRANTS** the plaintiff's motion for leave to proceed without prepayment of the filing fee. Dkt. No. 2.

The court **DENIES** the plaintiff's motion for leave to pay the filing fee from his release account. Dkt. No. 7.

The court **GRANTS** the plaintiff's motion for leave to amend the complaint. Dkt. No. 8. The court **ORDERS** that the amended complaint at Dkt. No. 9 is the operative complaint in this case.

The court **DEFERS RULING** on the plaintiff's motion for a preliminary injunction until after the defendants have received service. Dkt. No. 10.

The court **ORDERS** that, under an informal service agreement between the Wisconsin Department of Justice and this court, the clerk of court will send copies of the plaintiff's complaint and this order to the Wisconsin Department

of Justice for service on defendants Department of Corrections, Dr. Manlove, Schrubbe, McCreedy, Charles, DeYoung, Kampuis, and Dr. Weber.

The court also **ORDERS** that, under the informal service agreement between the Wisconsin Department of Justice and this court, defendants Department of Corrections, Dr. Manlove, Schrubbe, McCreedy, Charles, DeYoung, Kampuis, and Dr. Weber shall file a responsive pleading to the complaint within sixty days of receiving electronic notice of this order.

The court further **ORDERS** that defendants Scott Walker, Brian Foster, Stadtmueller, and John Doe (RHU Program Supervisor) are **DISMISSED**.

The court further **ORDERS** that the agency having custody of the plaintiff shall collect from his institution trust account the $347.39 balance of the filing fee by collecting monthly payments from the plaintiff's prison trust account in an amount equal to 20% of the preceding month's income credited to the plaintiff's trust account and forwarding payments to the Clerk of Court each time the amount in the account exceeds $10 in accordance with 28 U.S.C. § 1915(b)(2). The agency shall clearly identify the payments by the case name and number. If the plaintiff is transferred to another institution—county, state or federal—the transferring institution shall forward a copy of this order, along with the plaintiff's remaining balance, to the receiving institution.

The court will send a copy of this order to the Warden at Kettle Moraine Correctional Institution.

The court **ORDERS** that the parties shall not begin discovery until after the court enters a scheduling order setting deadlines for discovery and dispositive motions.

The court **ORDERS** the plaintiff to submit all correspondence and legal material to:

> Office of the Clerk
> United States District Court
> Eastern District of Wisconsin
> 362 United States Courthouse
> 517 E. Wisconsin Avenue
> Milwaukee, Wisconsin 53202

PLEASE DO NOT MAIL ANYTHING DIRECTLY TO THE COURT'S CHAMBERS. It will only delay the processing of the case. Because each filing will be electronically scanned and entered on the docket upon receipt by the clerk, the plaintiff need not mail copies to the defendants. All defendants will be served electronically through the court's electronic case filing system. The plaintiff should, however, keep a personal copy of each document he files with the court.

The court advises the plaintiff that if he does not file documents or take other court-ordered actions by the deadlines the court sets, the court may dismiss the case for failure to prosecute.

The parties shall notify the Clerk of Court of any change of address.

Failure to do so could result in orders or other information not being timely delivered, which could affect the legal rights of the parties.

Dated in Milwaukee, Wisconsin this 21st day of June, 2018.

**BY THE COURT:**

**HON. PAMELA PEPPER**
**United States District Judge**